UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVIN JEREMY RODRIGUEZ, | Case No. 1:19-cv-01388-DAD-HBK |
| Rodriguez, | FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS[1] |
| v. | |
| SCOTT FRAUENHEIM, | 14-DAY OBJECTION PERIOD |
| Respondent. | (Doc. No. 1) |

Petitioner Davin Jeremy Rodriguez ("Petitioner" or "Rodriguez") a state prisoner has pending a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1, "Petition"). The Petition raises two grounds for relief: (1) the trial court error erred when it permitted the admission of his statements made to police for impeachment purposes when the statements had been obtained in violation of *Miranda*[2]; and (2) the trial court erred when it failed to *sua sponte* instruct the jury on a lesser included offense of involuntary manslaughter. (*Id*. at 2). Respondent requests the Court to deny both grounds on the merits. (*See generally* Doc. No. 10). For the reasons set forth below, the undersigned recommends that the court deny both grounds on the merits, dismiss the petition and decline to issue a certificate of appealability.

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2019).

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

# I. BACKGROUND

## A. Procedural History

Rodriguez initiated this case on October 3, 2019 by filing the instant petition. (Doc. No. 1). On February 10, 2020, the Court ordered Respondent to respond to the petition. (Doc. No. 7). On April 8, 2020, Respondent filed an answer and lodged the pertinent state record. (Doc. Nos. 10, 11). After seeking an extension of time, Petitioner filed a reply to the answer. (Doc. Nos. 12, 14). On November 17, 2020, this case was reassigned to the undersigned. (Doc. No. 15).

## B. Facts Based Upon the Record

In 2016, a Fresno County jury convicted Rodriguez of voluntary manslaughter and found Rodriguez used a knife when committing the crime. *See People v. Rodriguez*, No. F075117, 2019 Cal. App. Unpub. LEXIS 4014, at *2-9 (June 14, 2019); (Doc. No. 11-17 at 2). Rodriguez was sentenced to 12 years in state prison. (Doc. No. 1 at 1). The Court adopts below the pertinent facts as summarized by the California Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### I. Prosecution Case

> The victim in this case, Jerald R., went to the Tower District in Fresno with a friend, Kimberly C., on the night of October 5, 2014, at approximately 9:45 p.m . . . Kimberly went to one of the restaurants on Olive Avenue to see if her brother, a security guard there, was on duty so she could ask him for money. The two parted company at the restaurant and planned to meet back there a short while later. Kimberly last saw Jerald walking westbound on Olive.
>
> Around 10:00 p.m., [witness] Reginald C[ombs] left one of the restaurants in the Tower District and was driving westbound on Olive when he saw two men he described as a slender Black man, identified as Jerald, and a shorter Hispanic man of average build, identified as defendant, facing each other on the north side of Olive. Reginald initially thought the men were playfighting but realized they were really fighting and, after he passed them, he made a U-turn in his car. He then made a second U-turn and pulled his car over to the curb on the north side of Olive to watch the men. He testified that both men were swinging and kicking at each other. By then he had rolled down his car window and he heard someone loudly say, "[O]h, you're pulling a knife out on me."
>
> Reginald testified that defendant took off and crossed Olive with Jerald right behind him. They then continued fighting on the south

side of Olive and both men ended up "tussling" on the ground. Reginald saw Jerald on his back and defendant on top of him. Reginald did not see any weapons but he heard the same voice as before say, "Oh, now you're stabbing me." Defendant then got up, took off his shirt and stood over Jerald for several seconds before running south down a cross street. Jerald stood up and took several steps west before collapsing on the sidewalk. Reginald exited his car and crossed the street to check on Jerald. After seeing a pool of blood, he called 911.

Dr. Chambliss, the forensic pathologist who conducted Jerald's autopsy, testified that Jerald's "upper teeth were disrupted, essentially knocked out" and he sustained nine stab wounds consistent with a single-edge blade; a cut to the side of his upper lip; multiple abrasions on his face, shoulders, elbow and thigh; and a fractured pinkie finger, although Chambliss could not determine if the fracture was fresh. Jerald had no abrasions or bruising on his hands, and he had been stabbed in the heart through his chest, in his lung through his back and three times in one arm pit in an area where there was a collection of blood vessels. In addition, he had a stab wound to his left shoulder that went approximately two inches into the muscle, a superficial stab wound to his right shoulder, a small stab wound to his jaw area, and a deep stab wound around his right knee. Chambliss testified that Jerald died from the injuries to his heart, lung and arm pit, and that the wound to the heart was almost immediately fatal, although it was possible for Jerald to have been stabbed on the north side of the street, continue the altercation and, without leaving a blood trail, cross the street before dying. Chambliss could not offer an opinion on which order the wounds were inflicted or how they were inflicted in terms of the men's positions.

**II. Defense Case**

    **A. Defendant's Testimony**

Defendant testified that he was going for a run that night wearing black Dickies pants and a tan shirt, and that he always carried a knife in his pocket for protection, although he had never needed to use it before. He described the knife as a folding knife that flipped open and had a two- or three-inch blade and a handle similar in size.

After crossing to the north side of Olive, defendant stopped at a doughnut shop along Olive to look at some tagging on a window and then continued westbound on Olive. As he was crossing Echo Avenue, he noticed someone following him. He turned around, asked why the man was following him and told the man—Jerald— to go away. Defendant testified that Jerald began walking quickly and then running toward him like he was going to attack. Jerald said something, but defendant did not hear what it was. Fearing an attack, defendant pulled the knife out of his pocket and flicked the blade open. As Jerald swung at him, defendant pushed Jerald with both hands: the palm of his left hand and his right hand, in which he held the knife. Defendant testified that although he was not sure, he

3

thought the knife connected with Jerald and Jerald said something about defendant stabbing him.  Defendant was not sure if any of Jerald's punches ever landed, but he testified that Jerald kept attacking him.  He also testified that several times, Jerald said, "[Y]ou're just going to stab me."

Defendant described trying to run backward and trying to turn around, without success.  He said he got low to the ground and then fell in the middle of Olive close to the south side, where Jerald kicked him and stomped him.  Defendant testified that Jerald did not sound like he was afraid and kept making comments about stabbing while defendant was yelling for him to go away.

Defendant got up from the ground and pushed Jerald, inadvertently stabbing himself in the hand.  The two men fell to the ground with Jerald on the bottom and defendant on top.  Defendant testified that Jerald was grabbing onto him and his shirt ended up pulled over his head.  Defendant kept swinging at Jerald until Jerald finally let go of him.  Defendant got up and ran, and Jerald said, "Keep running, you little bitch."  As defendant ran home, he removed his shirt, wrapped his bleeding hand in it, and threw the knife in an alleyway. He later threw his clothing away as well.

### B. Forensic Pathologist's Testimony

Dr. Chambliss testified for the defense that Jerald had 666 nanograms per milliliter of cocaine in his blood at the time of his death, as well as cocaine and marijuana metabolites.  Chambliss explained that a metabolite is a nonactive component and would not affect an individual, but the level of cocaine in Jerald's system was "a relatively higher amount" with under 100 considered low.  Although Chambliss did not know Jerald's history of drug use and could not offer an opinion regarding a specific individual's behavior at that level, he testified that cocaine is a stimulant and aggression can occur with cocaine use.

### III. Rebuttal

After defendant testified, the prosecutor played [defendant's] recorded police interrogation, and the trial court instructed the jury that it could consider the evidence only to assess the credibility of defendant's trial testimony.  During his interrogation, defendant repeatedly denied any involvement in the crime and denied he was on Olive on October 5, 2014, at approximately 10:00 p.m.

Detective Ledbetter testified regarding video surveillance footage police obtained from several businesses along Olive.  Although the altercation between defendant and Jerald was not captured on camera, Ledbetter was able to track defendant's movements along Olive that night walking eastbound on the south side of Olive and then crossing to the north side of Olive.  Ledbetter also tracked Jerald walking westbound on Olive and passing the doughnut shop without anyone walking in front of or behind him.  Ledbetter

4

> testified that defendant was looking at or into the window of the doughnut shop at 10:06:11, the victim was walking past the doughnut shop between 10:06:12 and 10:06:28, and defendant was leaning against the wall at 10:06:33.

(Doc. No. 11-17 at 3-7).

On direct appeal, Rodriguez claimed that his statement to the police was involuntary and that, therefore, the trial court erred in admitting his statement. (Doc. No. 11-17 at 2). Rodriguez also argued that the trial court erred in failing to *sua sponte* instruct the jury on involuntary manslaughter. (*Id*). The California Court of Appeal rejected both claims and affirmed his conviction. (*Id*. at 3). The California Supreme Court summarily denied review. (Doc. 11-19). Accordingly, both the grounds raised in the Petition have been exhausted before the state court.

## II.  APPLICABLE LAW

### A.  AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

///

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. White, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102. If such disagreement is possible, then the petitioner's claim must be denied. *Ibid*.

*Sexton*, 138 S. Ct. at 2558.

///

///

///

///

7

## III. ANALYSIS

In reviewing each of Petitioner's ground, the Court considers the last reasoned decision denying the grounds for relief—that of the California Court of Appeal.

### A. Ground One: Voluntariness of Petitioner's Statement Used for Impeachment

#### 1. Background

In his first ground for relief, Rodriguez attributes error to the trial court for admitting his statements made to police during their investigation of the crime. (Doc. No. 1 at 5). Rodriguez argued that, despite asking for an attorney multiple times during his police interview, the police officers continued to ask Rodriguez questions and Rodriguez continued to answer. (Doc. No. 11-3 at 7-13, 23). During the interview, Rodriguez denied being present in the area at the time of the crime and denied any involvement in the crime. (*Id*. at 13, 16, 21, 23). At trial, Rodriguez took the stand and testified on his own behalf. During testimony he admitted that he was present at the scene of the crime but claimed the victim attacked him and he injured the victim while acting in self-defense—contradicting his earlier statements to the police. (Doc. No. 11-11 at 30-39). The trial court determined that even though Rodriguez's interview contained *Miranda* defective statements, the statements were admissible for impeachment purposes. (Doc. No. 11-11 at 97-101, 125, 195). Accordingly, on cross examination, the trial court permitted the prosecutor to use Rodriguez's statements made to police to impeach his credibility. (Doc. No. 11-3 at 98).

#### 2. State Appellate Court Decision

Both the trial court and the Court of Appeal found that Rodriguez's statements were made in violation of his *Miranda* rights. ((Doc. No. 11-11 at 97-101, 125, 195; Doc. No. 11-17 at 7). On appeal, Rodriguez also argued that his statements were involuntary, and therefore not admissible for any reason. (Doc. No. 1 at 2). The California Court of Appeal rejected Rodriguez's claim, finding the statements were not involuntary and therefore were admissible for impeachment purposes. (Doc. No. 11-17 at 7). In pertinent part, the court of appeal found:

> [T]here is no dispute that detectives ignored defendant's requests for counsel, rendering his statement inadmissible other than for impeachment, but we have reviewed the audio of defendant's interrogation in full and conclude that defendant's claim of coercion is not supported by the record. Continuing an interrogation in the

8

face of repeated requests for counsel is a factor for consideration in determining whether a statement is involuntary, but defendant cites no authority holding that requesting counsel, even repeatedly, renders an interrogation coercive without more.

In [*People v. Neal*, 31 Cal. 4th 63 (2003)], the California Supreme Court was most concerned with the continued interrogation of the defendant despite his repeated invocation of his right to remain silent and his right to counsel, but other factors also informed its determination that the defendant's confession was involuntary, including "the circumstance that [the] defendant remained in custody without being provided access to counsel before requesting to speak to [the detective]; [the] defendant's youth, inexperience, minimal education, and low intelligence; the deprivation and isolation imposed on [the] defendant during his confinement; and the promise and the threat [the detective] made to defendant during the initial interrogation after questioning should have ceased ...." (*Neal, supra*, 31 Cal.4th at p. 78.)  The defendant in *Neal* was only 18 years old at the time of his interrogations, he had failed to graduate from high school and his intelligence "was quite low." (*Id.* at p. 84.)  He was questioned on three separate occasions and, between the first and second interrogations, he was detained overnight in a cell without access to a toilet or water.  In addition, he was not provided with any food until after the third interrogation, which was more than 24 hours later.  (*Id.* at pp. 74, 76.)

In this case, defendant was 23 years old at the time of the crime and subsequent interrogation, he was a high school graduate, and there is no indication in the record that his intelligence is low.  Moreover, the interrogation was brief at only 25 minutes, approximately; it was uninterrupted; and it commenced at the reasonable hour of 5:29 p.m.  In response to questions, defendant stated that he had not been drinking that day and did not use illegal narcotics, and when asked if he was mentally capable of speaking with them, he responded, "I am talking to you."  Although the detectives ignored defendant's requests for counsel until the very end of the interrogation, their voices remained calm and conversational throughout the interrogation, and the audio recording evidences no aggression or other tactics designed to break defendant's free will.

Defendant's responses to detectives' questions do evidence frustration over being questioned about a crime he denied committing, but they do not suggest he was frightened, "decompensat[ing]," or "vulnerable and helpless," as defendant suggests.  To the contrary, defendant was coherent and responsive during the interrogation and nothing in the record indicates he was mentally or physically impaired.

The California Supreme Court has made clear that continuing with an interrogation despite a defendant's invocation of rights constitutes police misconduct and any statement so obtained is "'obtained *illegally*.'"  (*Nguyen, supra*, 61 Cal.4th at p. 1077, quoting *Peevy, supra*, 17 Cal.4th at p. 1204.)  Nevertheless, having evaluated the totality of the circumstances in this case, we find no

9

> error in the trial court's determination that defendant's statement was voluntary and therefore admissible for impeachment purposes. In light of this conclusion, we need not address whether the admission of defendant's statement was prejudicial.

*Rodriguez*, No. F075117, at *12-15.

### 3. Analysis

Under *Miranda v. Arizona*, a criminally accused has the right to receive certain warnings prior to speaking with police investigators, including a warning regarding the accused's right to counsel under the Sixth Amendment.  384 US 436 (1966).  Statements taken by police in violation of a criminal defendant's *Miranda* rights are not admissible in the prosecution's case in chief at trial.  *Harris v. New York*, 401 U.S. 222, 224 (1971).  However, when the accused testifies on his own behalf at trial, previous statements made to police may be used to impeach his credibility, including those statements obtained in violation of *Miranda*.  *See id*. at 226 ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements."); *see also Kansas v. Ventris*, 556 U.S. 586, 594 (2009).

The rule from *Harris*, however, is not absolute.  According to Supreme Court precedent, "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law."  *Mincey v. Arizona*, 437 U.S. 385, 398 (emphasis in original); *Michigan v. Harvey*, 494 U.S. 344, 351 (1990) (recognizing the Supreme Court has "mandated the exclusion of reliable and probative evidence for *all* purposes only when it is derived from involuntary statements.") (emphasis in original).  To determine whether a statement made to police was voluntary, courts are directed to consider the following factors: the age, education level, and intelligence of the accused, the lack of advice the accused received regarding his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment in connection with the questioning.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In ascertaining voluntariness, the "ultimate test" asks whether the subject's "will has been overborne and his capacity for self-determination critically impaired" and such a

10

determination does not turn "on the presence or absence of a single controlling criteria." *Id*. at 225-26.

Here, the Court of Appeal considered the totality of the circumstances, as required by *Schneckloth*, and reasonably found that Rodriguez's statement was not coerced. Because the Court of Appeal found that Rodriguez' statement was not coerced, its finding that the statement was admissible for purposes of impeachment, pursuant to *Harris*, was not contrary to or an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court. Nor was the Court of Appeal finding based on an unreasonable determination of the facts in light of the evidence presented. The undersigned has reviewed the state court record for this case, including the transcript of Rodriguez's interview. The interview was brief and the police officers did not use coercive language or threats. The undersigned cannot find evidence that Rodriguez's "will [was] overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225-26. Because the state court's rejection of this ground was not contrary to clearly established federal law nor based upon an unreasonable determination of the facts, the undersigned recommends ground one be denied on the merits.

**B. Ground Two: Jury Instruction on Lesser Included Offense**

**1. Background**

In his second ground for relief, Rodriguez assigns error to the trial court when it failed to *sua sponte* instruct the jury on involuntary manslaughter, a lesser included offense of murder. (Doc. No. 1 at 7). More specifically, Rodriguez argues the evidence presented at trial supported an involuntary manslaughter instruction because his testimony supported a finding that he acted out of fear of the victim, the stab wounds occurred during his efforts to extricate himself from the situation, and he lacked the intent to kill the victim. (*Id*.). The record reflects Rodriguez advanced a theory of self-defense at trial. (Doc. No. 11-11 at 40-56; Doc. No. 11-12 at 22-24, 28-33, 48). The court instructed the jury on second degree murder, voluntary manslaughter on heat of passion and imperfect self-defense theories, and self-defense. (Doc. No. 11-3 at 105-122; Doc. No. 11-11 at 200-01; Doc. No. 11-17 at 12).

\\\

**2. State Appellate Court Decision**

The court of appeal rejected Rodriguez's argument that the trial court had a duty to *sua sponte* instruct on involuntary manslaughter on the basis that there was not substantial evidence of the absence of malice, as required for a finding of involuntary manslaughter. (Doc. No. 11-17 at 12). In relevant part, the court of appeal found:

> Jerald was just over six feet tall and weighed 160 pounds, and Dr. Chambliss described him as slim but muscular. Defendant was 5 feet 6 inches tall and weighed approximately 220 to 230 pounds at the time of the crime, and he testified he was afraid of Jerald. He argues that he did not intend to kill Jerald but instead wanted "to convince, by the 'show of force' via the pocket knife, to leave [him] alone" and he maintains that the presence of multiple stab wounds does not alter this conclusion. He concedes that the first stab wound was likely the fatal wound to Jerald's chest, but contends that the wound did not immobilize Jerald, there is no evidence that he knew he had fatally stabbed Jerald and, to the contrary, the fight between the two continued as they crossed the street and fell to the ground with Jerald on top of defendant. Defendant casts the multiple stab wounds he inflicted as "indicative of [his] frenzied attempt to extricate himself from the situation."
>
> "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense ...." [Citation.] Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude the defendant committed the lesser, but not the greater, offense." (*Brothers, supra*, 236 Cal.App.4th at p. 34; accord, *People v. Evers* (1992) 10 Cal.App.4th 588, 596, 12 Cal. Rptr. 2d 637 ["If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice."].) "[W]hen the evidence presents a material issue as to whether a killing was committed with malice, the court has a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense, even when the killing occurs during the commission of an aggravated assault. [Citations.] However, when ... the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter." (*Brothers, supra*, at p. 35.)
>
> We agree with defendant that in determining whether there is substantial evidence requiring an instruction, his version of events may not be disregarded; it is for the trier of fact to evaluate witness credibility and determine the facts. Even so, we are not persuaded by defendant's characterization of his testimony as constituting

12

substantial evidence that he acted without malice when he stabbed Jerald.

Under defendant's version of events, he pulled the knife from his pocket and flicked it open as Jerald ran toward him and before Jerald made any contact with him, he pushed Jerald with both hands, one of which held the knife and likely inflicted the fatal wound to Jerald's heart. The two then swung at each other, at some point defendant fell to the ground and swung at Jerald with the knife while Jerald kicked at him, and then the two ended up crossing Olive with Jerald behind defendant. Based on the blood evidence on the north side of Olive, Jerald was stabbed at least once before the altercation moved across the street. On the south side of Olive, the two men ended up on the ground with defendant on top of Jerald. Defendant described Jerald grabbing him while he kept swinging with the knife. Despite this account of the altercation, Jerald did not have any abrasions or bruises on his hands, his teeth were knocked loose or out, he had multiple abrasions on his body, and he had nine stab wounds and a cut near his mouth. Defendant, in contrast, sustained a self-inflicted stab wound to his hand but did not testify to any other injuries and said he was not sure if Jerald landed any blows.

The Court of Appeal's decision in *Brothers*, addressed by both parties, is instructive. In that case, the defendant, with assistance from others, attacked and brutally beat a longtime friend of hers after allegations were made that he molested her grandchildren. (*Brothers, supra*, 236 Cal.App.4th at pp. 27-28.) One of men who participated in the attack on the victim shoved a rag down the victim's throat. (*Id.* at p. 28.) The Court of Appeal for the Second District rejected the defendant's claim that the trial court should have instructed sua sponte on involuntary manslaughter, commenting, "Even crediting Brothers's testimony in its entirety, there was simply no evidence from which a reasonable juror could entertain a reasonable doubt that Brothers had acted in conscious disregard of the risk her conduct posed to [the victim's] life. Brothers's own account unequivocally established she engaged in a deliberate and deadly assault because she had been enraged, 'out of control,' and unable to calm herself." (*Id.* at p. 34.) "There was no evidence of an accidental killing, gross negligence or Brothers's own lack of subjective understanding of the risk to [the victim's] life that her and her confederates' conduct posed." (*Ibid.*)

While we agree with defendant that some distinctions may be made between the facts in *Brothers* and the facts here, those distinctions do not compel the conclusion, urged by defendant, that here, there was substantial evidence from which a reasonable trier of fact could have concluded that he acted without malice. To the contrary, stabbing someone repeatedly with a knife is without question "a type of aggravated assault the natural consequences of which are dangerous to human life" and there is no evidence that defendant failed to "subjectively appreciate[] the danger to human life his ... conduct posed ...." (*Brothers, supra*, 236 Cal.App.4th at p. 35.)

///

13

> We note that after briefing was complete in this case, a different division of the Second District Court of Appeal found the refusal to instruct on involuntary manslaughter in a beating case prejudicial error and it reversed the defendant's conviction. (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 790, 241 Cal. Rptr. 3d 882 (*Vasquez*).) The victim in that case had metal rods in his neck from a prior spinal surgery. (*Id.* at p. 791.) Although the defendant and another man punched the victim approximately 15 times, the defendant stomped the victim's head and body approximately 20 times, and the other man threw a metal trash can at the victim, the fatal injury was a neck fracture that occurred just below the victim's jawline adjacent to the metal rods, which "could have acted as a fulcrum and contributed to the break." (*Ibid.*) None of the victim's other injuries were lethal (*ibid.*), and the defendant could not have known the victim's neck was more vulnerable due to the implanted rods (*id.* at p. 796). The Court of Appeal, observing that "California courts have long recognized that not all beatings are life-threatening" (*ibid.*), concluded that "[a] reasonable juror could have inferred from [the] evidence that the blows were not particularly severe and further inferred that [the] defendant believed beating up [the victim] would injure him but not kill him" (*ibid.*).
>
> We need not decide whether we agree with this conclusion because *Vasquez* is readily distinguishable from the facts in *Brothers* and those here. In *Vasquez*, the victim had a hidden vulnerability and the defendant used his hands and feet to beat victim. (*Vasquez, supra*, 30 Cal.App.5th at p. 791.) In contrast, the victim in *Brothers* was beaten with a broom, burned with cigarettes and had a gag stuffed deeply down his throat (*Brothers, supra*, 236 Cal.App.4th at pp. 27-28), and here, the victim was stabbed repeatedly with a knife. Given the repeated use of a knife against Jerald, no reasonable juror could have concluded that defendant "lack[ed] a subjective awareness that his conduct carrie[d] "'a high degree of probability that it [would] result in death.'" (*Vasquez, supra*, at p. 795, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 152, 59 Cal. Rptr. 3d 157, 158 P.3d 731.) We therefore conclude that, in this case, the trial court did not have a sua sponte to duty to instruct the jury on involuntary manslaughter and we reject defendant's claim to the contrary.

*Rodriguez*, No. F075117, at *18-25.

### 3. Analysis

First, to the extent Rodriguez claims that the trial court's failure to instruct the jury on involuntary manslaughter was a violation of state law, his claim is not cognizable on federal habeas review. "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Waddington v. Sarausad*, 555 U.S. 179, 192 n.5, (2009) ("[W]e have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The "fact that [a jury] instruction was allegedly

14

incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72. Therefore, this Court is bound by the Court of Appeal's interpretation of its own state law and cannot grant habeas relief on this basis. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Second, to the extent Rodriguez claims the absence of a lesser included offense instruction violated clearly established federal law, the undersigned finds no support for his claim in Supreme Court precedent. 28 U.S.C. § 2254(d)(1). While the Supreme Court has held a defendant has the right to a lesser included offense instruction in a capital case where there is evidence to support the instruction, this right has not been extended to defendants in non-capital cases. *Beck v.* Alabama, 447 U.S. 625, 638 (1980); *see also Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) ("[T]he failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) (same). Thus, the Court of Appeal could not have applied Supreme Court authority unreasonably in denying Rodriguez's claim based on the failure to give a lesser included offense instruction in this non-capital case. 28 U.S.C. § 2254(d)(1); *see Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (internal quotation omitted). Thus, Petitioner's argument that the trial court's failure to give a lesser included offense instruction is not cognizable on federal habeas review.

Furthermore, to find a constitutional right to a lesser-included offense instruction in this non-capital case would require the application of a new rule of law, which the Court may not do

in habeas proceedings pursuant to *Teague v. Lane*, 489 U.S. 288 (1989). *See Solis*, 219 F.3d at 929 (habeas relief for failure to instruct on lesser included offense in non-capital case barred by *Teague* because it would require the application of a new constitutional rule). Consequently, Rodriguez has not shown that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

Alternatively, Rodriguez has not shown that the Court of Appeal's decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Griffin v. Harrington*, 727 F.3d 940, 945 (9th Cir. 2013) (quoting *Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000) (explaining that to grant a habeas petition under § 2254(d)(2), a state court's factual findings must be 'clearly erroneous,' not just merely debatable).

In California, involuntary manslaughter is defined as the unlawful killing of a human being without malice. Cal. Pen. Code § 192. Involuntary manslaughter occurs when an unlawful killing of a human being occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection lesser included." *Id*. at § 192(b). California trial courts have a duty to instruct the jury *sua sponte* on all lesser included offenses if there is "substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." *People v. Brothers*, 236 Cal. App. 4th 24, 34 (2015). There is no *sua sponte* duty to instruct on involuntary manslaughter where the defendant "indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law" and "no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed." *Id*. at 35. The Court of Appeal concluded the evidence presented at trial did not support an involuntary manslaughter instruction

because there was not substantial evidence of the absence of malice.  (Doc. No. 11-17 at 18).

Considering the evidence presented at trial, it was reasonable for the Court of Appeal to find that there was not substantial evidence of the absence of malice, and therefore that the trial court did not have a duty to *sua sponte* instruct on involuntary manslaughter.

Based on the foregoing, Rodriguez fails to demonstrate the state court's *sua sponte* failure to instruct on the lesser included offense was contrary to, or an unreasonable application of, clearly established federal law, or that the state court's decision was based on an unreasonable determination of fact.  The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.  The undersigned recommends that ground two be denied as without merit.

### III.  CERTIFICATE OF APPEALABILITY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **RECOMMENDED**:

1.  Grounds one and two of the Petition be denied on the merits and the Petition be

1  dismissed. (Doc. No. 1).

2  2. Petitioner be denied a certificate of appealability.

### NOTICE TO PARTIES

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with these findings and recommendations, a party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (*citing Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:   December 17, 2021

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE